

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 2-09-331-CV**

IN THE INTEREST OF K.S., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

The trial court terminated Appellant Mother's parental rights to K.S. after finding that her parent-child relationship had been "terminated with respect to another child based on a finding that [her] conduct was in violation of [section] 161.001(1)(D) or (E), Texas Family Code" and that terminating her parental rights to K.S. was in K.S.'s best interest.[2] *See* Tex. Fam. Code Ann. § 161.001(1)(M), (2)

---

[1] *See* Tex. R. App. P. 47.4.

[2] The trial court also terminated the parental rights of P.B.-H., K.S.'s alleged father, but P.B.-H. does not appeal.

(Vernon Supp. 2009). In two issues, Mother challenges the legal and factual sufficiency of the evidence to support the best interest finding. We affirm.

## II. Termination of Parental Rights

### A. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under

2

subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, .206(a) (Vernon 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider,

3

however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**B. Best Interest**

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). Among others, the following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:
the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and whether the child's family demonstrates adequate parenting skills. *Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

5

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**C. Evidence**

**1. Mother and her Children**

Mother is thirty-three years old and has given birth to six children. Fourteen-year-old Bradley[3] and nine-year-old Bethany live with Mother's sister, although Bethany sometimes lives with Mother. Twelve-year-old Kathleen lives "[b]etween

---

[3] We use aliases for the children's names. *See* Tex. R. App. P. 9.8(b)(2).

6

[Mother] and [Kathleen's paternal] grandmother."[4] Mother's parental rights to three-year-old Peter were terminated in October 2006 on endangerment grounds. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2). Her parental rights to two-year-old Pam were terminated in February 2008 on endangerment grounds.[5] *See id.* K.S. was born on July 25, 2008.[6]

### 2. Mother's Drug Use

Mother testified that she did not remember the first time that she used an illegal drug or started using cocaine or heroin, but she admitted that in 2005, her drug use caused her child Bethany to have to live with Mother's sister. Mother was on methadone while pregnant with Peter, and she used drugs while pregnant with Pam "because [she] didn't plan on having her" and had planned to have an abortion "[f]rom day one."

---

[4] Mother testified that her three older children live with her "whenever they're there" and that it was "not an everyday thing because my sister don't want no problems or whatever, but they come and they—well, they just live with me because my sister kind of stayed there or whatever for like six months or whatever."

[5] Mother stated that she "did stuff" on her service plans in those cases, that she "just didn't show up on the last court date because [she] had the time wrong," and that her rights were terminated.

[6] Mother is not sure who K.S.'s father is. She testified that he could have been P.B.-H., who is also Peter and Pam's alleged father, or he could have been someone that she met "on the streets" a few years back. P.B.-H.'s parental rights to Peter and Pam were terminated in the same orders terminating Mother's rights to them.

7

K.S. was conceived around November or December 2007. Mother agreed that she might have told a doctor at John Peter Smith (JPS) hospital in May 2008 that she had stopped using heroin three months earlier—that is, around February or March 2008—and she admitted that she probably used illegal drugs for at least a month or two before she realized that she was pregnant with her sixth child, K.S. She stated that she would not have used drugs if she had known she was pregnant and that she did not use cocaine after she discovered that she was pregnant. Mother testified that she did not think that two months of drug use while pregnant endangered K.S. "[b]ecause she was born and it didn't."[7] Mother testified that once she discovered she was pregnant and started seeing a doctor, in March or April 2008, the doctor sent her to a methadone clinic so that she would not "take the chance or risk of using heroin while [she] was pregnant."[8] Mother said that she did

---

[7] Mother elaborated with the following testimony,

Q. Do you believe that your use of drugs while you were pregnant with [K.S.] placed her in danger?

A. No, because I didn't use while I was pregnant with her up until I found out I was pregnant and started going to the doctor. Then the doctor put me on methadone and that was that. I did not use no more after I was pregnant with her. She was fine.

[8] The Child Protective Services (CPS) affidavit in support of the Department of Family and Protective Services (DFPS) petition indicates that Mother tested positive for cocaine in March, April, and May 2008, but not at K.S.'s delivery in July 2008. Mother admitted that her urinalysis drug tests were positive in March and April 2008.

8

not think the methadone would be harmful to use because the doctor knew she was pregnant and gave it to her.

Nona Pickler, the neonatal nurse-practitioner who admitted K.S. to JPS's neonatal intensive care unit (NICU) on July 28, 2008, testified that it is common practice for a doctor to give a mother methadone if the mother is trying to quit using heroin. "It's considered safer because of the means they have to go through to get heroin."

Pickler testified that K.S. was transferred to NICU at two-and-a-half-days old because she was exhibiting withdrawal symptoms. K.S. was placed on morphine shortly after admission to treat her withdrawal from methadone.[9] After ten days of morphine, K.S. still required treatment. Pickler noted that not all babies have such severe withdrawal.

In April 2009, Mother stated that it had been a year since the last time she used heroin and that she had probably used cocaine less than ten times since K.S.'s birth. Sheila Quarterman, who became Mother's second CPS worker in December 2008, testified that Mother told her in March 2009 that it had been three months since she last used any kind of illegal drugs. Mother testified that she told Quarterman that her hair follicle test could be positive

---

[9] Pickler described methadone withdrawal symptoms: irritability, seizures, sweating, diarrhea, and tachypnea (rapid breathing) from metabolic acidosis. K.S. had to have intravenous fluids to supplement her intake because she was not able to eat.

[b]ecause it goes back up to six months, and I know back then, when I first started going through this, and I have a habit of, instead of making a situation better, I go the opposite way and dig into a deeper hole, so therefore, you know, *I did use, because that was the answer to my problems instead of me doing what I was supposed to do*, so I knew if it goes that far back that I would, but I have not used drugs in a long time. [Emphasis added.]

She testified that her answer to K.S. being in foster care had been cocaine.

Mother also listed the drugs for which she had prescriptions: Seroquel—which she testified had been prescribed the day before trial started in April 2009—for mood swings; hydrocodone—which she had started taking in July 2008—for her teeth; and Celexa, for depression. She testified that she could not recall the name of her dentist, that she could not pronounce her psychiatrist's name, and that she did not have health insurance.

### 3. Mother's Service Plan

Daisy Yancy, Mother's first CPS worker, gave Mother a service plan,[10] which was filed in September 2008. Mother testified that she knew what a service plan was, that she received one in October 2008, that she most recently received one in March 2009, and that her service plan required random urinalysis tests and hair follicle drug tests, a psychological evaluation, parenting classes, individual counseling, and a drug and alcohol assessment. The record reflects that the service plan contained not only those activities but also asked Mother to "identify appropriate

---

[10] A CPS service plan requires a parent to perform certain tasks to ensure that reunification with a child will provide the child with a safe environment. *See In re A.D.*, 203 S.W.3d 407, 409 (Tex. App.—El Paso 2006, no pet.).

relatives and friends that are willing to help care for [K.S.] . . . [and] secure a stable contact phone number to maintain regular contacts with the family members and the caseworker"; "complete all tasks on her service plan and maintain regular contact with the caseworker [and] notify her caseworker . . . of any problems with her services or any changes of her contact phone number and address"; "maintain regular and consistent contact with [K.S.] via supervised visits by [CPS]"; "seek and maintain legal gainful employment to allow her financial independence, and to provide [CPS] with proof of her employment"; and "maintain stable housing that is safe and appropriate for [K.S.] and submit proof of housing to [CPS] . . . [and] allow the [case]worker to assess her home as needed for home assessments."

Mother did not work on the service plan from October 2008 through December 2008. She explained,

> I wasn't going to do it because I didn't never have a reason why they took my child to begin with, and I talked to a couple of lawyers, and I was supposed to hire me a lawyer that was going to fight for all of this, so I wasn't for sure if I was even going to have to go through all that or not.

She reiterated that she "wasn't planning on doing none of that, because [she] was getting a lawyer," and that a lawyer told her that she would not have to do the service plan.[11] Quarterman testified that when she first spoke with Mother, Mother was very

---

[11] Mother stated that the trial's purpose was "[a] big lie." She claimed that CPS never told her why it became involved with K.S.—"they lied and took my child from NICU talking about she had withdrawal from methadone and then talking about they had to find out if I was legally on methadone."

11

hostile and "[s]he stated that she wasn't going to do any of the services; her lawyer had told her she wouldn't have to."[12] Mother also attributed her failure to work services to a lack of communication.[13] She said that she did not consider that it had been six months since she received the service plan but rather saw it as just one month because no judge told her to work the service plan until March 2009. By April 2009, Mother had not had a visit with K.S. since October 2008.[14]

Regarding a court-ordered hair follicle drug test in March 2009, Mother gave a sample of leg hair that was too short for testing. She stated, as to giving a hair sample from her head, "I don't want that . . . and I'm not doing it."[15] She testified,

---

[12] The trial court appointed a lawyer for Mother on August 6, 2008. By August 22, 2008, a different lawyer—the one who represented her at the termination trial—appears in the record. Although Mother told Quarterman that she had hired a lawyer, Mother's subsequent testimony that "[she] was planning on getting a lawyer to fix all of this," makes it seem more likely that she never actually hired a lawyer before one was appointed for her.

[13] Mother also complained about some delays with her CPS referrals for services. Quarterman explained that Mother had a previous service authorization for her individual counseling and was discharged from the program when she missed that appointment so Quarterman had to fax a new authorization. Quarterman testified that all of the payment paperwork for Mother's services had been done in advance of Mother trying to schedule the appointments.

[14] Mother responded, "If you say so," when asked whether she had only limited or no contact with CPS or her child from August 2008 to February 2009. After March 18, 2009, when Mother resumed contact with CPS, one of the visits had to be cancelled by CPS and Mother missed the other because she was sick. Mother attributed missing other visits to her lack of transportation.

[15] Mother stated, "I could have done [the head hair sample], but I told the judge that day I wasn't going to take it off, and she said as long as they could take it from anywhere that that was fine, and that's what they did."

"[T]he lady told me that it was fine to take it off my leg because I had enough hair [on my legs]"; therefore, she concluded, it was not her fault that her leg hair sample was insufficient. Mother subsequently agreed that she would submit to a hair follicle drug test using the hair on her head "if that was the last resort, but there is other ways they can do it. I would do whatever I have to do to get my child back."

Mother said that CPS told her that she did not have to do another psychological evaluation, and Quarterman confirmed this. Mother claimed that she had completed her parenting classes, but she was referring to the ones that she took as part of her CPS service plans for either Peter or Pam, before K.S. was born. On April 23, 2009, Quarterman testified that she was under the impression that Mother had completed the parenting classes recently, that she was not sure whether completing the parenting classes before K.S. was born met CPS's requirements, and that Mother had not completed her drug and alcohol assessment or her individual counseling.

Mother testified that she was supposed to go to her alcohol and drug assessment on April 23 and that it had taken so long to schedule because she did not know her CPS caseworker had been changed until March. Mother's first contact with Quarterman was a week or so before the March 18, 2009 hearing. They scheduled a meeting, but Mother failed to appear, so their first encounter was at the March 18 hearing. Quarterman said that she learned of Mother's address "for

certain on March 18th. I had already sent her out, when I first took over the case, a registered letter asking her to contact me, and it came back."

Mother testified that she pays $500 a month in rent on a three-bedroom, two-bath house and that she has lived there throughout the case. Mother described a friend, Van Alvin, who she has known for ten years, as a "god-friend" that pays her bills, including her utilities. She stated that she did not know what kind of work he did, that he was an older man, that he helps her with her other children, and that she trusts him. She testified that her cable bill is in P.B.-H.'s name and that she could not remember the last time she was employed full-time, but it was not during the last year. For the last two years, she has occasionally helped her godmother, Ruby, with Ruby's catering business; she works for Ruby at least once a month and does odd jobs.

Quarterman testified that she did not know whether Mother's residence was safe for a child because

> we've had some trouble getting hold of each other. I would call her and her phone would be shut off, and the other day, I did call to schedule an appointment to go out to see her home, and when she answered, she told me that she was sleeping and she would call me back, and she never called me back.

CPS visited Mother's residence in August 2009. Mother explained the presence of a man's clothing as belonging to her fourteen-year-old son, who she said is six feet, three inches tall and wears a size fourteen in men's shoes. She testified that her

son loves clothing, "He loves clothes and shoes, and I have a hundred pairs of shoes."

Mother twice received additional time to work on her service plan. On March 18, 2009, the trial court granted her a continuance. After hearing evidence at the April 23, 2009 termination trial, the trial court gave her until August 10, 2009, when the termination trial resumed.[16]

By August 2009, Mother had a third CPS worker, Carson,[17] who testified that Mother had not completed her parenting classes and counseling and that Mother had not attended her Comprehensive Addiction Treatment Services (CATS) outpatient drug treatment sessions since July 15, 2009. Carson testified that Mother had been to every visit since April 23 except for one that was cancelled by the transporter and that CPS did not have the results back from Mother's most recent drug test.

Mother testified that CPS had requested four drug tests since April, that she had taken all but one, and that the three she had taken were negative.[18] She

---

[16] The trial court terminated P.B.-H's parental rights after the April 23, 2009 trial.

[17] The record is unclear with regard to this worker's first and last names—the worker is reported solely as "Carson" in the reporter's record, but in the clerk's record, "Vicki Garza" is listed.

[18] Mother testified that she missed the fourth drug test because she was at a visit with K.S. and two of her older children and she did not make it in time, giving the following explanation:

15

testified that she had two parenting classes left, that she went to individual counseling every week, and that, based on her drug and alcohol assessment, she went into a seven-day inpatient drug rehabilitation for Vicodin, which had been prescribed for her because her teeth hurt. She testified that she had not been abusing Vicodin and that she did not remember what she told the assessors for her to be admitted to inpatient treatment. Mother finished rehab on June 15, 2009, and then started CATS. With regard to her CATS sessions, Mother was not sure how many she had completed but testified that she had eight left. She stated that she tried to go to her CATS sessions every day but sometimes she could not make it because she had other appointments, including doctor's appointments, and her other children, and because "it's the summertime" and she had been doing "everyday stuff." She testified that she is in Narcotics Anonymous (NA) and has a sponsor.

### 4. Plans for K.S.

Mother gave conflicting testimony about K.S.'s foster parents. At first, she testified that she was not related to K.S.'s foster mother and that she had no relationship with K.S.'s foster parents that allowed their involvement in the case. But Mother also testified that the foster mother was Mother's sister's cousin, that she had

---

[I asked w]ell, can you be at the office by 5:00 or 5:30 or something like that, and she was like, if you come and the doors are not open or locked already, just call me and I'll open the door or something or other, and I was like, okay, but I have da-da-da-da-da to do, but I will try to get up there, and she was like, okay, *but I didn't make it*, but I went that following week the next time she asked me. [Emphasis added.]

16

no concerns about the foster parents' ability to take good care of K.S., that she believed the foster parents were taking good care of K.S., and that she had no problem with K.S. continuing to live with the foster parents "other than that she needs to be with [Mother]."[19]

Quarterman testified that K.S. was doing very well with the foster parents, that she had seen K.S. in the foster parents' home, and that the foster parents wanted to adopt her. The foster mother testified that K.S. had been in her home since October 2008, when K.S. was three months old. She testified that she had known Mother all of her life, that Mother had not called to inquire about how K.S. was doing "since the first of the year," and that Mother had not brought K.S. anything.[20]

Mother received the foster mother's cell phone number in October 2008 and was supposed to contact her every Wednesday. Athough Mother testified that she "used to see [her] child all the time when she first got took with [sic] CPS," she did not remember whether she only saw K.S. twice at visits when K.S. was first placed into foster care, and she admitted that she had not called K.S.'s foster mother for a couple of months.

---

[19] Mother testified that the foster parents were taking good care of K.S. but that she "can take care of her just as well."

[20] Quarterman also testified that Mother never called her about having any clothes, food, or toys for K.S. Mother said that everything for K.S. was at home and that the foster mother "said to keep it so when if [K.S.] comes back to [Mother], [Mother] will have it. It's okay; [the foster mother] will buy her whatever she needs. She has a roomful of stuff from diapers, wipes, clothes, baby bed, bouncers, stroller, or walker at my house right now."

The foster mother testified that she believed Mother's parental rights to K.S. should be terminated based on Mother's past history and in K.S.'s best interest. She and her husband, along with their son who was graduating from high school, had decided that if Mother's parental rights to K.S. were terminated, they wanted to adopt K.S. because they love her.

Mother testified that she was a responsible parent and that the court should allow her to keep her parental rights to K.S. "[b]ecause, for one, [she] didn't do nothing for her to get taken, and for two, [she was] trying to do what [she was] supposed to do to get her back." She testified that she loves K.S. and wants her back, and at the April 2009 trial, she asked the trial court, "Please give me time to do what I've got to do, because I'm trying, and everything that's done happened is not my fault. It's CPS's fault also. They're just as accountable as I am."[21] At the April 2009 trial, Quarterman testified that she did not believe the trial court should allow Mother any more time and that termination of Mother's parental rights would be in K.S.'s best interest.[22]

---

[21] In April, Mother reminded the trial court, "[W]hen I came last time, you told me as long as I'm doing what I'm supposed to do that you would give me time."

[22] Quarterman explained that she thought Mother's parental rights should be terminated "[b]ecause [K.S.], she's bonded well with the [foster parents]. She's thriving. [Mother], although she has attempted in the last month to do some services, it would appear that she waited almost until the court hearing to start working services."

In August, Mother made one more plea to the trial court for K.S.'s return, stating:

> Give me my baby back and continue—I continue everything I'm supposed to do, and as long as I don't mess up everything, I have my baby, and I'll still do drug tests, finish up my classes, whatever else. Just give me my baby, because there is nothing more for me to have motivation and strength with my baby with me than having to go see her one hour on a Friday every day; then when she leaves me she cries and all that stuff. *I mean, I think my baby should be with me. How can I get to know her if she's not with me?* [Emphasis added.]

Carson opined that Mother had had enough time between April 23, 2009, and August 10, 2009, to complete her parenting classes, CATS, and individual counseling. She asked the trial court to terminate Mother's parental rights to K.S. as in K.S.'s best interest.

## D. Analysis

Mother argues that the evidence is legally and factually insufficient to prove that termination of her parental rights is in K.S.'s best interest because the evidence at trial showed that she was not at fault for K.S. exhibiting withdrawal symptoms[23] and because she has shown a desire to stay away from illegal drug use and to develop better parenting skills "by her accomplishments toward the objectives of the Family Service Plan prior to the second trial hearing."

However, as recounted above, not only does Mother have a significant substance abuse history, but for the duration of most of the case, she was unwilling

---

[23] Mother attributes K.S.'s withdrawal symptoms to her efforts to rehabilitate herself from her past drug use during pregnancy, rather than the actual use of illegal drugs during pregnancy.

to cooperate with CPS and undertake the services that would return K.S. to her, even though she had been through the process twice before with Peter and Pam. *See* Tex. Fam. Code Ann. § 263.307(b)(10)–(11); *R.R.*, 209 S.W.3d at 116; *see also In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (recognizing parent's failure to comply with family service plan may be factor, among others, supporting best-interest finding).

Instead, Mother dropped out of contact with CPS and K.S.'s foster parents, and out of K.S.'s life, for around six months, and she admitted turning to drugs during that time. The trial court could have concluded from Mother's failure to complete her service plan after receiving two opportunities to finish it—the continuance after the March 2009 hearing and again until the August 2009 trial—and her failure to remain in contact with K.S.'s foster parents even after she renewed contact with K.S. and her CPS worker that K.S. would be subjected to high levels of emotional danger if Mother were to retain her parental rights. *See Holley*, 544 S.W.2d at 371–72. The trial court could have concluded that Mother's inadequate parenting skills—two previous termination of parental rights cases and three remaining children living with her part-time, if at all—and her shaky finances, depression, and potential for relapsing into drug addiction also posed unreasonable physical and emotional dangers to one-year-old K.S. *Compare In re S.A.G.*, No. 02-09-00125-CV, 2010 WL 1006301, at *8 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.) (holding evidence supporting best interest finding was factually

20

sufficient when, among other reasons, Mother had a past history of not being able to provide her children with a safe environment, as established by the termination of her rights to another child based on endangerment and abandonment findings, failed to complete the parenting classes required under her service plan, and had an ongoing pattern of memory problems), *and In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *7 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (holding evidence supporting best interest finding was legally and factually sufficient, considering mother's continuing course of illegal drug use, transience, failure to complete individual counseling and parenting classes, to do the psychological evaluation, to provide proof of gainful employment, and to attend more than thirteen of forty-four scheduled visits), *with In re W.C.*, 98 S.W.3d 753, 765–66 (Tex. App.—Fort Worth 2003, no pet.) (holding evidence factually insufficient to support best interest finding when, among other things, the mother fully complied with her service plan in all respects except for her court-ordered child support payments; the evidence showed that she had made significant progress, improvements, and changes in her life; and the record reflected that there was nothing more she could have done in order to have her children returned).

The trial court could have chosen to believe Carson, rather than Mother, with regard to Mother's progress since April on her service plan.[24] Mother admitted that

---

[24] The trial court had two separate opportunities to assess Mother's credibility, and we cannot say, based on the record presented to us, that its determination was unreasonable. *See J.P.B.*, 180 S.W.3d at 573–74.

21

K.S.'s foster parents take good care of her. K.S.'s foster parents testified that they love K.S. and want to adopt her. Quarterman, Carson, and K.S.'s foster mother each testified that terminating Mother's parental rights to K.S. would be in K.S.'s best interest; in contrast, Mother's testimony focused on Mother's need for K.S., rather than K.S.'s best interest. Viewing the evidence in the light most favorable to the finding and judgment, we conclude that the evidence is such that the trial court could reasonably form a firm belief or conviction that termination of Mother's parental rights is in K.S.'s best interest. *See J.P.B.*, 180 S.W.3d at 573. And we conclude, in light of the entire record, that the trial court could reasonably form a firm conviction or belief that termination is in K.S.'s best interest. *See H.R.M.*, 209 S.W.3d at 108. We hold that the evidence is legally and factually sufficient to support the trial court's best interest finding, and we overrule Mother's two issues.

### III. Conclusion

Having overruled both of Mother's issues, we affirm the trial court's judgment.


BOB MCCOY
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: June 17, 2010

22